# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF COLORADO
### The Honorable Michael E. Romero

| | |
|---|---|
| In re: ) | |
| ) | Case No. 03-12994 MER |
| DAVID MASCIO ) | |
| MONICA L. MASCIO ) | Chapter 7 |
| ) | |
| Debtors. ) | |
| ) | |
| ) | |
| PAUL GRONEWOLLER and ) | Adversary No. 03-1482 MER |
| GRONEWOLLER AND ASSOC., INC., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | |
| DM CAPITAL, INC.; DAVID MASCIO; ) | |
| and MAM CAPITAL, LLC, ) | |
| ) | Signed/Docketed |
| Defendants. ) | September 29, 2011 |

## ORDER

THIS MATTER comes before the Court on the *Order Affirming In Part and Reversing In Part Bankruptcy Court's Order*, entered March 30, 2011, by the Honorable Christine M. Arguello of the United States District Court for the District of Colorado (the "District Court Order"). The Court has reviewed the trial record, its previous orders, and the instructions contained in the District Court Order, and finds and concludes as follows.

The District Court Order remanded the above-captioned matter to this Court for re-calculation of damages, stating:

> The Bankruptcy Court cited the proper standard, but failed to properly apply it. In the February 25, 2009 Order, the Bankruptcy Court stated that its task was to determine "the difference between the value of the 49% investment in the business as represented by Mascio and the actual value of the investment." (Doc. # 19-13 at 10.) In the May 13, 2010 Order, however, the Bankruptcy Court's damage calculation did not account for the fact that Gronewoller purchased only a 49% share of MAM's assets. (Doc. #197-17 at 8.) This was clear error.
>
> Furthermore, the Bankruptcy Court should have looked only at the actual and represented value of the company on the date of payment. Under Colorado law, Gronewoller is entitled to receive "the difference between the actual value of the

property *at the time of purchase* and its value at that time had the representation been true." *Colorado Performance Corp. v. Mariposa Assoc's.*, 754 P. 2d 401, 408 (Colo. App. 1987) (quoting *Wagner v. Dan Unfug Motors, Inc.*, 529 P. 2d 656, 657 (Colo. App. 1974) (emphasis in original); *Estate of Korf v. A. O. Smith Harvestore Products, Inc.*, 917 F. 2d 480, 483 (10th Cir. 1990) (applying Colorado law). In the damage calculation, the Bankruptcy Court averaged all of the represented value estimates testified to by Gronewoller without filtering the evidence so that it pertained only to the represented value at the "time of purchase." Under Colorado law, values prior to or subsequent to the date of payment are irrelevant. Although the Bankruptcy Court's decision to average the various represented values is understandable given that Gronewoller testified to numerous values, it was error for the Bankruptcy Court to consider evidence of value at times other than the date of purchase.

Accordingly, the award of $150,355 must be vacated and the case remanded for further proceedings consistent with this opinion. On remand, the Bankruptcy Court should apply the standard that it set forth in its February 25, 2009 Order. That is, Gronewoller should receive 49% of the difference between the actual value of the company and the represented value of the company on the date of purchase.[1]

**Actual Value as of January 1, 2001**

As noted by the District Court, Gronewoller purchased his 49% interest in MAM Capital, LLC ("MAM") in January 2001.[2] Gronewoller's initial testimony indicated, based on an analysis of assets under management (sometimes referred to by the parties as "AUM") by MAM, the actual value of the company as of January 1, 2001 was $337,905.[3] He later testified, however, based on a calculation from MAM's Global Portfolio Statement of December 30, 2000, the actual value as of January 1, 2001 was $428,070.[4] When asked which of the two values was the most reliable, Mr. Gronewoller stated:

> Q: (by Mr. Paul Swedlund, attorney for Mr. Gronewoller) Okay. So as between the two actual valuation values summarized on page 3 of your report, A and B, which of the two values do you think is most likely represents [sic] the actual value of the corporation or the LLC as of January 1st, 2001 when you made your investment?

---

[1] *DM Capital, Inc., et al. v. Gronewoller et al. (In re Mascio)*, No. 10-cv-01501-CMA, pp. 13-14 (footnote omitted) (D. Colo. March 30, 2011).

[2] *DM Capital, Inc., et al. v. Gronewoller et al. (In re Mascio)*, No. 10-cv-01501-CMA, p. 2 (D. Colo. March 30, 2011).

[3] Gronewoller Exh. 134 at 4, ¶ A.

[4] Gronewoller Exh. 134 at 5, ¶ B.

> A: (by Mr. Gronewoller) Well, that's a good question, and I assume that the asset under management report value was -- would be the best one to use in determining or estimating the actual value of the firm. There are names on the global portfolio statement that I am not familiar with, there's a couple of accounts there that probably shouldn't be there, so I relied on the asset under management report here.[5]

However, since both subsection A of Gronewoller's Exhibit 134, "The LLC's January 1, 2001 AUM Report," and subsection B of Gronewoller's Exhibit 134, "MAM, Inc.'s December 30 2000 Global Portfolio Report," contain information as to assets under management, Gronewoller's statement at trial is ambiguous. Therefore, the Court will rely on Gronewoller's written statement in his Exhibit 134 as to the relative reliability of Subsections A and B:

> The discrepancies between the GPS [Global Portfolio Statement] and January 1, 2001 AUM Reports, as well as the fact Mascio generated the January 1, 2001 AUM at a time when he had a legal and financial motivation to demonstrate more than $12,310,178 in AUM if more had really existed, suggests that the January 1, 2001 AUM report is a more reliable record of the company's actual AUM at the time of Gronewoller's investment than the December 2000 GPS report.[6]

This statement indicates Gronewoller's belief the relevant data for determining the January 1, 2001 actual value were the assets under management, and the most reliable of the assets under management data were found in "The LLC's January 1, 2001 AUM Report." Reliance on that report provides an actual value of $337,905, which is the value the Court adopts, based on Gronewoller's own assertions.

**Represented Value as of January 1, 2001**

With respect to the represented values testified to by Gronewoller, and reflected in his Exhibit 134, Sections C–G, the Court finds as follows:

• Paragraph C–the "Napkin Representation," states: "Following Mascio's initial offer to sell an interest in his investment management business, Mascio attempted to alter his offer terms several times. On one of these occasions late in October 2000 at the Silver Grill Mascio indicated on a napkin that the true value of the business was at least $485,000. . ."[7]

---

[5] Transcript of August 12, 2009 Hearing on Damages, p. 14, lines 10-23, filed at Docket No. 300.

[6] Gronewoller Exh. 134 at 4, ¶ A.

[7] Gronewoller Exh. 134 at 5, ¶ C.

Page 3 of 6

- Paragraph D–the "Sprout Offer," states: "Several times during the spring and summer of 2000 Mascio indicated that Jim Sprout had offered to buy Mascio's business for $500,000 and bring Mascio into Sprout's firm."[8]

- Paragraph E–"Mascio's Summer of 2000 Representations," states: "During the summer of 2000 Mascio delivered to Gronewoller [an assets under management report that formed the basis for this represented value]. . . .[The report] was among the documents removed from Gronewoller's office on or after August 24, 2000, . . . and has not been recovered."[9]

- Paragraph F–"Gronewoller's initial $515,000-$700,000 valuation range," states: "At the first meeting in late July 2000. . .Gronewoller asked for and Mascio provided financial statements. . . . The financial statements, calculations, and other notes and documents used in the original valuation. . . were removed from [Gronewoller's] office on August 24, 2000. . .[and] have not been recovered."[10]

- Paragraph G–"SEC Form ADV," states: "The SEC report indicated AUM of $31,703,209 and was based on an August 31, 2000, AUM that Mascio provided to Gronewoller. . . . Mascio's response to SEC Form ADV. . . states: 'In October, 2000, the assets managed by Mascio Asset Management Inc. exceeded $30 million and are anticipated to remain above that level through December 31, 2000. . .'"[11]

Further, on pages 3-4 of Exhibit 134, Gronewoller set forth the method he used to determine valuations based on Paragraphs A, B, E, and G:

> 4. Valuation Methodology and Results:
>
> Analysis of the LLC's January 1, 2001, [sic] AUM report, the MAM, Inc. GPS as of December 30, 2000, the SEC Form ADV, and Mascio's summer/fall 2000 AUM representations to Gronewoller involves estimating the management fees that each AUM representation would generate and then applying a Gross Revenue Multiplier (GRM) to estimate the fair market value of an entity generating that particular amount of gross revenue or management fees. It is assumed for each of the four gross revenue analyses (A, B, E, and G) that the account sizes are relatively equivalent to those of the 78 accounts noted in the LLC's January 1, 2001, [sic] AUM report.

---

[8] Gronewoller Exh. 134 at 5, ¶ D.

[9] Gronewoller Exh. 134 at 6, ¶ E.

[10] Gronewoller Exh. 134 at 6, ¶ F.

[11] Gronewoller Exh. 134 at 6-7, ¶ G; see also Gronewoller Exh. 3, SEC Form ADV, p. 36.

> Gross revenue in financial practice is defined as all fees, commissions and other revenues collected. As only the investment management part of MAM, Inc. was to be transferred to the LLC only the estimated investment management fee revenue will be evaluated. The GRM used in this calculation is derived from a sample of 400 real-life transactions occurring during calendar year 2000 that re complied by and reported in Practice Transitions Report: 2001 Practice Value & Data Survey for Buyers & Sellers of Financial Services Firms, produced by Business Transitions, LLC in cooperation with Moss Adams, LLP. The U.S. average GRM for fee-only practice transactions occurring during 2000 was 2.1. Fee only practices transaction prices occur at an average 18% premium over fee based (70%+ of revenues from fees), at an average 48% premium to commission-only practices, and at a 28% premium over the average ratio. Transactions in the Southwest region, which include Colorado, occur at an 11% premium over the average. . . . [12]

At trial, Gronewoller testified as follows regarding the representation in Paragraph G, and his determination of MAM's value based on that representation:

> Q: (by Mr. Swedlund) And what value for the company were you able to calculate based on that representation [Paragraph G]?
>
> A: (by Mr. Gronewoller) I estimated two values based on this. One excluding the Amato account and another including the Amato account. Excluding the Amato account, again, we used the 31-700 -- 31,703,000-plus, distributed that amount over the 70 -- the 78 accounts from the asset – from the January 1 assets under management report, calculated the fees that we would have earned on that, multiplied that by four, and then that by 2 -- the 2.1 gross revenue multiplier. Excluding the Amato account, the value was 712,684; including the Amato account, the value was 743,385.
>
> Q: (by Mr. Swedlund) Now, as between the values that you have listed in part G of your report, with and without the Amato account, which do you think is the more accurate
>      representation of the value of the company?
>
> A: (by Mr. Gronewoller) I believe it's proper to exclude the Amato account.[13]

Thus, Exhibit 134 and Gronewoller's testimony indicate the only represented value with a clear connection to the January 1, 2001 purchase date is the represented value supported by Paragraph G. Specifically, the other representations arise from documents or conversations held before the January 1, 2001 purchase date, and, more importantly, the record does not contain

---

[12]   Gronewoller Exh. 134 at 3-4.

[13]   Transcript of August 12, 2009 hearing, p. 24, line 12–p. 25, line 2.

testimony that Gronewoller relied on them on the date of purchase. Therefore, filtering the evidence as directed by the District Court, the Court cannot tie the representations of Paragraphs C, D, E, and F to the January 1, 2001 purchase date.

Paragraph G, on the other hand, has two elements connecting it to the January 1, 2001 purchase date. First, Mascio stated the October 2000 assets under management exceeding $30 million were anticipated to remain above that level through December 31, 2000–right before the January 1, 2001 purchase. Second, and most importantly, respecting Paragraph G, in response to the question, "What did you believe that the assets were at the time you made your investment?" Gronewoller answered, "I believed that they were right at $31 million–or right at $30 million."[14] As set forth above, in Exhibit 134 and in his testimony, Gronewoller had calculated the total value of MAM, based on the Paragraph G representation, to be $712,684.[15]

**Damage Calculation**

Accordingly, pursuant to the calculation method set forth by the District Court, the comparison to be made is between the actual value of $337,905 in the LLC's January 1, 2001 AUM report, and the represented value set forth in Paragraph G, $712,684. Subtracting $337,905 from $712,684 equals $374,779. Forty-nine percent of $374,779 is $183,641.71, or 49% of the difference between the actual value of the company and the represented value of the company on the date of purchase.

Based on these findings and conclusions,

IT IS ORDERED damages are hereby awarded to Gronewoller in the amount of $183,641.71.

Dated September 29, 2011

BY THE COURT:

Michael E. Romero
U.S. Bankruptcy Judge

---

[14] Transcript of August 12, 2009 hearing, p. 25, lines 14-17.

[15] Transcript of August 12, 2009 hearing, p. 24, line 12–p. 25, line 2. Gronewoller noted the value estimate would have been $743,385 including an account known as the "Amato account," but stated he believed it was proper to exclude the Amato account, resulting in a value of $712,684.